IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GNC HOLDINGS, LLC, | |
| *Plaintiff*, | Civil Action No. 2:25-cv-1667 |
| v. | Hon. William S. Stickman IV |
| EVOLVE LOGISTICS LLC, | |
| *Defendant*. | |

**<u>MEMORANDUM OPINION</u>**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff GNC Holdings, LLC ("GNC") brought this breach of contract action against
Defendant Evolve Logistics LLC, ("Evolve") for Evolve's refusal to pay damages to GNC after
Evolve lost GNC's freight. (ECF No. 1). GNC has filed a motion for judgment on the pleadings
(ECF No. 9), which Evolve opposes. For the following reasons, the motion will be granted.

## I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early
enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P.
12(c).[1] In reviewing a motion for judgment on the pleadings, courts apply the same standards as
when reviewing a motion to dismiss under Rule (12)(b)(6). *Turbe v. Gov't of V.I.*, 938 F.2d 427,
428 (3d Cir. 1991) (citations omitted). The Court considers the pleadings and exhibits attached
thereto, matters of public record, and "undisputedly authentic documents attached to the motion

---

[1] Federal Rule of Civil Procedure 7(a) provides that the pleadings are closed upon the filing of a
complaint and an answer (absent a court-ordered reply), unless a counterclaim, crossclaim, or
third-party claim is interposed, in which event the filing of an answer to a counterclaim,
crossclaim answer, or third-party answer normally will mark the close of the pleadings. FED. R.
CIV. P. 7(a). The pleadings are closed in this case.

1

for judgment on the pleadings if plaintiffs' claims are based on the documents." *Atiyeh v. Nat'l Fire Ins. Co. of Hartford*, 742 F. Supp. 2d 591, 595 (E.D. Pa. 2010); *see also Wolfington v. Reconstructive Orthopaedic Assocs*. II PC, 935 F.3d 187, 195 (3d Cir. 2019) (stating that a court may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the … claims are based upon these documents." (citations omitted)).  The allegations "presented in the pleadings and the inferences to be drawn therefrom" must be accepted and construed "in the light most favorable to the nonmoving party."  *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3rd Cir. 2008) (citation omitted).  Judgment is granted only when the moving party establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law.  *Sherzer v. Homestar Mortg. Servs.*, 707 F.3d 255, 257 (3d Cir. 2013) (citing *Allstate Prop. & Cas. Ins. v. Squires*, 667 F.3d 388, 390 (3d Cir. 2012)).

## II.    FACTUAL BACKGROUND

The undisputed facts are as follows.  GNC and Evolve entered into a Master Broker Transportation Service Agreement effective December 12, 2022 ("MBTA"). (ECF No. 1, ¶ 13; ECF No. 6, ¶ 13).  Evolve agreed to provide GNC with certain freight transportation services. (ECF No. 1-1, p. 1; ECF No. 1, ¶ 14; ECF No. 6, Answer ¶ 14.1).  On March 9, 2025, a trailer containing GNC's freight operated by Evolve's carrier, Leopard Logistics, Inc. ("Leopard"), was stolen from the Indianapolis metropolitan area (the "Stolen Freight").[2] (ECF No. 1, ¶ 23; Answer ¶ 23; ECF No. 6, Third-Party Compl.,  ¶¶ 13-16.).  On March 17, 2025, GNC sent Evolve a formal claim for the loss of the Stolen Freight. (ECF No. 1-2; ECF No. 1, ¶ 26; ECF No. 6, Answer ¶ 26.).  Counsel for GNC sent correspondence to Evolve on September 23, 2025, demanding that Evolve pay GNC $334,482.45, which represented the Stolen Freight's total

---

[2] The Stolen Freight has not been recovered. (ECF No. 1, ¶ 24; ECF No. 6, Third-Party Compl. ¶ 16.).

value, less the $100,000 that GNC received from the carrier, and less approximately $40,000 in current receivables that GNC applied against its losses pursuant to the MBTA. (ECF No. 1-3; ECF No. 1, ¶ 33; ECF No. 6, Answer ¶ 33.).  Evolve did not respond to the letter or pay GNC for the Stolen Freight, thus prompting GNC to file this lawsuit on October 24, 2025.  (ECF No. 1).

In the MBTA, Evolve agreed that it was "solely responsible for selecting Carriers, arranging for pickup and delivery of shipments by GNC, and ensuring safe and timely shipment" of GNC's freight.  (ECF No. 1-1, ¶ 7, ¶ 2.2).  It further agreed that it and its carriers would "promptly, safely, and efficiently receive, transport, and deliver the freight entrusted to" them by GNC and deliver the freight in "like good order and condition." (*Id*. at  ¶ 2.3).  Evolve agreed that it would perform its "transportation services using personnel of required skill, experience, and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under the Agreement."  (*Id*. at ¶ 3).

As to liability, the MBTA provides that Evolve "shall, even where Carriers are used, continue to be fully liable for any loss, damage, or delay to shipments."  (*Id*. at ¶ 7).  The MBTA further provides that Evolve shall "defend, indemnify, and hold [GNC] harmless" from any "losses, damages, . . . or expenses arising from or relating to" Evolve or its carrier's performance under the MBTA—or damage to GNC's freight in the course of that performance. (*Id*. at ¶ 10). As to any lost or damaged freight while such freight is in Evolve or its carrier's care, custody, or control, the MBTA explains Evolve's liability as follows:

> Broker's Cargo Liability: Broker assumes liability for loss, delay, damage to or destruction of freight while under Broker's or a Carrier's care, custody or control, or while it should be under the control of Broker or a Carrier under the terms of this agreement or applicable law. Freight which has been tendered to the Broker or a Carrier intact, and released by Broker or such Carrier in a damaged, lost or

3

destroyed condition subsequent to such tender, shall be conclusively presumed to have been lost, damaged or destroyed while under Broker or such Carrier's care, custody, or control, unless Broker can establish otherwise by clear and convincing evidence. Broker's liability shall include (a) the value of the freight lost or damaged (value to be determined by the full invoice value), (b) that portion of any freight charge made or paid for the whole shipment that corresponds to the value of the lost or damaged freight, (c) GNC's administrative expenses incurred in connection with documenting and requesting payment for damages sustained in connection with such loss or damage (whether by the filing of formal court claims against Broker or otherwise), (d) GNC's reasonable attorney fees, and (e) any other direct, incidental, or consequential damages suffered by GNC. If damage occurs in route, it is GNC's discretion to have the Broker or Carrier, at no additional cost, transport the freight to the facility of GNC's choice. At GNC's option, Broker shall either allow GNC to deduct from the amount GNC owes Broker or pay GNC the full and actual loss amount.

(ECF No. 1-1, ¶ 19; ECF No. 1, ¶ 18; ECF No. 6, Answer ¶ 18.). The MBTA requires Evolve to maintain certain insurance coverage, including $1,000,000 in general liability coverage, $5,000,000 in umbrella coverage, and a minimum of $300,000 in "all risk cargo liability insurance per vehicle for the full and actual cash value of the freight transported by" Evolve or its carrier. (ECF No. 1-1, ¶ 5; ECF No. 1, ¶ 19; ECF No. 6, Answer ¶ 19.)

### III. ANALYSIS

Under Pennsylvania law,[3] "[i]t is well-established that three elements are necessary to [prove] a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman*, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002)). "The paramount goal of contract interpretation is to determine the intent of the parties." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011) (citation omitted). "[A] contract is unambiguous if it is reasonably capable of only one construction."

---

[3] The parties do not dispute that this matter is governed by Pennsylvania law as set forth in the MBTA. (ECF No. 1-1, ¶ 13).

4

*Tamarind Resort Assocs. v. Gov't of the Virgin Islands*, 138 F.3d 107, 110-11 (3d Cir. 1998). Ambiguity exists in a contract when its language "is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). The Court will not "distort the meaning of the language or resort to a strained contrivance," however, "in order to find an ambiguity." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999).

The parties do not dispute that the MBTA is a valid and enforceable contract. Evolve has admitted that a trailer containing GNC's freight operated by its carrier, Leopard, was stolen and that the Stolen Freight has not been recovered. (ECF No. 1, ¶ 24; ECF No. 6, Third-Party Compl. ¶ 16.). The MBTA is clear that Evolve assumed liability for the freight while in Leopard's care, custody, or control. (ECF No. 1-1, ¶ 19). Evolve breached the MBTA by failing to compensate GNC for the Stolen Freight and for failing to respond to GNC's notice of claim within forty-five (45) days of receipt.

The Court rejects Evolve's attempt to avoid liability by arguing that the force majeure clause of the MBTA applies. That clause states:

> Neither party will be deemed to have defaulted under or breached this Agreement to the extent such party is unable to perform its obligations under this Agreement due to acts of God or the public enemy, floods, fires, storms, closing of public highways, government interference, government regulations, terrorism, or other instances beyond the control of the affected party. Any party invoking this clause must provide prompt written notice to the other party.
>
> Should [Defendant] invoke this section, GNC shall have the right to use other means to fulfill GNC's transportation requirements awarded to [Defendant] and will have no liability to [Defendant] with respect to shipments impacted by [Defendant's] invocation of this section. [Defendant] shall use reasonable efforts to remove or avoid the condition and resume, or have Carriers resume, performance as soon as possible.

(ECF No. 1-1, ¶ 11).  Generally speaking, "[a] force majeure clause lists a series of events such as earthquakes, storms, floods, natural disasters, wars, or other 'acts of God' which the parties to a contract have agreed upon as excuses for nonperformance." *Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 61 n.9 (Pa. Super. 2012) (citation omitted). "To determine whether a certain event excuses performance," courts look to the express language of the contract to derive the parties' intent.  *Morgantown Crossing, L.P. v. Manufacturers & Traders Trust Co.*, Civ. A. No. 03-cv-4707, 2004 WL 2579613, at *6 (E.D. Pa. Nov. 10, 2004) (citation omitted).  Furthermore, when a clause provides a list of examples followed by a catchall term (or "residual clause"), the preceding list provides a clue as to what the drafters intended the catchall provision to mean.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).  This is the rationale for the canon of construction known as eiusdem generis, which is Latin for "of the same kind."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199–213 (2012).

Here, the parties defined the contours of force majeure in their agreement, and those contours dictate the application, effect, and scope of force majeure.  Evolve reads the force majeure clause far beyond its enumerated contents.  The Court holds that the provision relating to a force majeure event does not address lost or stolen goods; rather, it speaks to acts of God, civil disorders, environmental disasters, and other like events.  This is informed by the fact that the MBTA contains several provisions making Evolve solely liable for loss of freight and responsible for arranging and ensuring safe and timely shipment of GNC's freight (ECF No. 1-1, ¶¶ 7, 2.2.), and it specifically requires Evolve to defend, indemnify, and hold GNC harmless from any losses that result from Evolve or its carrier's acts or omissions or failure to perform under the MBTA (*Id*. ¶ 10.).

Furthermore, Evolve cannot now use the force majeure clause of the MBTA to argue that it is not liable for freight stolen over one year ago while in the possession of its carrier, Leopard. Prior to the initiation of this lawsuit, Evolve never responded to GNC and it certainly never provided written notification that it was invoking the force majeure clause. The force majeure clause placed a duty on Evolve to give notice of the force majeure event. In the pleadings in this lawsuit, Evolve failed to identify exactly what events listed in the force majeure clause apply to the Stolen Freight and the factual underpinnings of why that made Evolve unable to compensate GNC for the Stolen Freight as required by the MBTA. The first time Evolve mentioned the possibility of a force majeure event or its invocation of the clause was in response to GNC's motion. The Court will not countenance such gamesmanship; Evolve neglected to provide written notice of a force majeure event, and it certainly has not raised a genuine issue of material fact with respect to its breach of the MBTA. GNC is entitled to judgment as a matter of law.

## IV.   CONCLUSION

For these reasons, the Court will grant GNC's motion by Order of Court to follow.

BY THE COURT:


 s/  William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE


July 10, 2026
Dated